**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | |
| v. | : | **Case No. 21-cr-270-01 (JEB)** |
| | : | |
| **REY RIVERA RUIZ,** | : | |
| | : | |
| Defendant. | : | |

<u>**GOVERNMENT'S MEMORANDUM IN AID OF SENTENCING**</u>

The United States, by and through its attorney, the United States Attorney for the District of Columbia, hereby submits the following memorandum in support of its request that the Court sentence the defendant Rey Rivera Ruiz to 235 months imprisonment followed by five years of Supervised Release and a $100 Special Assessment.

<u>**FACTUAL BACKGROUND**</u>

The Court is familiar with the facts of this multi-defendant, violent drug trafficking conspiracy by way of motions filed, plea hearings (to include the factual proffers in the defendant's case and his co-conspirators'), and the evidence (including co-conspirator testimony produced at the trial of *United States v. Jann Aponte Rivera* (21-cr-270-02 (JEB)), which commenced on October 30, 2023, before this Court). In support of its sentencing request, the government will summarize the salient facts including the trial testimony which addressed the defendant's conduct, and co-conspirator Aponte Rivera's post-arrest statement where he stated he committed the October 14, 2020 shooting at the instruction of the defendant; as well as additional facts the government may present at the sentencing hearing.

However, put succinctly, the defendant managed and supervised a Puerto Rican drug trafficking organization (DTO) that spanned at least 18 months and was responsible for sending

1

50 to150 kilograms of cocaine to the Washington, D.C. area.  As part of his role, the defendant employed several individuals to assist him with his drug trafficking to include:  help obtain, package, and send cocaine to the mainland United States; travel from Puerto Rico to the Washington, D.C. area to collect  drug proceeds; and inflict violence on anyone who threatened the interests of the Puerto Rican DTO.  Ultimately, that violence bore out when on October 14, 2020, co-conspirator Aponte Rivera, who worked for the defendant, attempted to kill the leader of the Washington, D.C./Maryland area DTO in Puerto Rico, severely injuring him and killing his girlfriend, Shantay Butler.

**A.  Factual Proffer**

Beginning around October of 2019, and continuing up to about April 15, 2021, in the Washington, D.C. area, Puerto Rico, and other locations, the defendant, Rivera Ruiz, conspired to distribute and possess with the intent to distribute five kilograms or more of cocaine.  Specifically, the Federal Bureau of Investigation (FBI), the United States Postal Inspector Service (USPIS), the Montgomery County Police Department (MCPD), and the Frederick County Police Department (FCPD), conducted a large-scale narcotics, violent crime, and money laundering investigation into a Washington, D.C./Maryland based DTO, and a Puerto Rico based DTO.  Based on the investigation, law enforcement identified multiple Puerto Rico based drug traffickers, to include the defendant, and at least five other individuals who were involved in trafficking multiple kilograms of cocaine a month from Puerto Rico, via the United States Postal Service (USPS), to the mainland United States including the Washington D.C. area.   In turn, Washington, D.C./Maryland-based DTO members distributed the cocaine throughout the greater-Washington, D.C. area.

Cooperating witnesses (CWs), who pled guilty to the offense of conspiracy to distribute and possess five kilograms or more of cocaine, agreed to assist law enforcement in hopes of

receiving a lesser sentence.  The CWs were shown known photographs of several individuals and positively identified members of the drug conspiracy, including the defendant, and numerous other drug traffickers.  The CWs also detailed the various roles of the members of the conspiracy. According to the CWs, the defendant was the primary point-of-contact in Puerto Rico to obtain cocaine: the defendant obtained the kilograms of cocaine in the San Juan area; the defendant set the prices for the kilograms; the defendant stored the kilograms prior to being shipped to the mainland United Sates; the defendant had his associates package the cocaine and mail the packages of cocaine from Puerto Rico post offices to addresses in the mainland United States; and the defendant had his associates (at the defendant's direction) traveled to the mainland United States to collect drug proceeds from the Washington, D.C. based DTO members.  The defendant oversaw, managed, and supervised at least five associates who took instruction from the defendant regarding actions of the Puerto Rico based DTO.

Law enforcement identified at least 65 parcels shipped from Puerto Rico to the mainland United States believed to contain cocaine shipped by this DTO.  Law enforcement intercepted and lawfully searched a number of these parcels.  Each parcel intercepted and searched contained kilogram quantities of cocaine verified by drug analyses.  The cocaine analyzed from these parcels and the undercover purchases in the Washington, D.C. area totaled over five kilograms.

At the defendant's direction, his associates shipped these parcels from different post offices around San Juan, Puerto Rico—usually with fictitious names and addresses for the sender and recipient in an attempt to evade detection by law enforcement.  Law enforcement estimates that the remaining non-seized parcels each contained approximately .5 to two kilograms of cocaine based upon what was recovered in the seized parcels as well as information provided by CWs.

On April 1, 2021, the defendant along with Aponte Rivera, Michael Gabriel Hernandez Rivera, and Nomar Francisco Medina Diaz, were indicted in a one-count indictment charging the offense of conspiracy to distribute and possess with intent to distribute five kilograms or more of a mixture and substance containing a detectable amount of cocaine, in violation of 21 United States Code Sections 846, 841(a)(1) and 841(b)(1)(A)(ii), *see* Case No. 21-cr-270 (JEB).

On or about April 15, 2021, a search warrant was executed at the defendant's residence, as well as the residence of one of his co-conspirators.  At the defendant's residence, law enforcement found a receipt for a USPS parcel which was mailed on April 9, 2021.  Law enforcement was able to locate the parcel in the mail stream and found it contained a kilogram of cocaine, packaged consistent with prior seized parcels.

Through travel records, surveillance, and witnesses' statements, the defendant and his three indicted co-conspirators traveled between Puerto Rico and the Washington, D.C. area, and other locations on the east coast in furtherance of drug trafficking—including travel to collect drug proceeds from U.S. based drug traffickers.  For example, between March 24, 2020, and April 2, 2021, the Puerto Rico DTO members traveled to or from Puerto Rico to the Washington, D.C. area at least 50 times.  The defendant himself traveled to and from Puerto Rico to the Washington, D.C. area at least six times during the above-mentioned drug trafficking conspiracy.  The CWs told law enforcement that these trips were to obtain drug proceeds from previous supplied cocaine shipments, and the CWs said that they personally provided the drug traffickers drug proceeds.

Additionally, on October 7, 2020, the leader of the Washington, D.C./Maryland DTO traveled to San Juan with Ms. Butler.  CW-2 discussed the outstanding drug proceeds the Washington, D.C./Maryland DTO leader owed the defendant.  On the evening of October 14, 2020, the Washington, D.C./Maryland DTO leader and Ms. Butler were ambushed and repeatedly

shot.  The Washington, D.C./Maryland DTO leader was shot five times, remained in a coma for several days but survived; Ms. Butler was shot two times in her head and died from gunshot wounds.

Through investigation, law enforcement established repeated and consistent telephone contacts between the defendant, and his co-conspirators (to include Aponte Rivera, Hernandez Rivera, and Medina Diaz).  Law enforcement also has surveillance and video footage of the defendant meeting with co-conspirators in Puerto Rico and the mainland United States in furtherance of the conspiracy.

The defendant acknowledged and agreed that, during the course of the conspiracy, he was accountable for at least 50 kilograms of cocaine but less than 150 kilograms, which represents the total amount that the defendant distributed or possessed with intent to distribute, or was reasonably foreseeable conduct of the co-conspirators.  Additionally, the defendant admitted that he managed or supervised criminal activity involving at least five participants.

**B. Trial Testimony**

During the trial in *United States v. Jann Aponte Rivera,* the government presented a substantial amount of powerful evidence of the defendant's high-level role in this drug conspiracy. This included witness testimony, law enforcement surveillance, kilograms of seized cocaine, and video evidence from Aponte Rivera's cellular telephone which included videos of the defendant meeting co-conspirators in the Washington, D.C. area, and the defendant using a money counter to count drug proceeds the night before the murder of Ms. Butler.



Additionally, two cooperating witnesses testified to the defendant's conduct during the drug trafficking conspiracy which spanned over 18 months. Specifically, CW-1, who was an upper echelon member of the Washington, D.C./Maryland DTO and who pled guilty to his role in the drug conspiracy, testified on October 31, 2023 that the defendant was one of the Washington, D.C./Maryland DTO's cocaine suppliers, providing kilogram quantities of cocaine (10/31/23 am session Tr. P. 98, 7 to 100, 8). CW-1 discussed the events leading up to the October 14, 2020 murder of Ms. Butler including wherein Aponte Rivera told CW-1 that "it's not good," because CW-2 owed "a lot of [drug money] and [CW-2] can't leave the island" (10/31/23 pm session Tr. P. 38, 2-16). These comments were a reference to drug proceeds CW-2 owed the defendant (10/31/23 pm session Tr. P. 39, 6-15). After Ms. Butler was murdered, the defendant and Aponte Rivera called CW-1 over FaceTime (10/31/23 pm session Tr. P. 45. 9-11). During the call, and in the presence of the defendant, Aponte Rivera told CW-1 "Papi, you see the things that I do?," a reference to killing Ms. Butler and severely wounding CW-2 (10/31/23 pm session Tr. P. 46, 7-8).

CW-2 was the leader of the Washington, D.C./Maryland DTO and also pled guilty to his role in the drug conspiracy. In extensive detail, during CW-2's trial testimony, CW-2 described

the drug trafficking partnership he had with the defendant, as well as the events leading up to the October 14, 2020 murder of Ms. Butler and CW-2 being shot five times by Aponte Rivera.  CW-2 discussed the profits they made from distributing the kilograms of cocaine supplied by the defendant noting that CW-2 ran a "multi-million dollar" drug trafficking business (11/7/23 Tr. am session P. 50, 12), with the cocaine being supplied by the defendant.  Also, as detailed in CW-2's plea hearing, factual proffer, and trial testimony, CW-2 received between 50 to 150 kilograms of cocaine from the defendant.  Using the most conservative estimates (50 kilograms at $30,000 a kilogram), the wholesale value of this amount of cocaine is $1,500,000.  This amount does not take into account the ultimate profit made during the drug conspiracy after the cocaine was cut up and distributed to the streets of Washington, D.C and Maryland.   CW-2 explained that CW-2 "hired (Aponte Rivera) for a thousand dollars a week" for protection of his drug trafficking business during the drug conspiracy (11/7/23 Tr. am session P. 5, 2-5).  As the Court is aware, Aponte Rivera was a member of the defendant's DTO and sent to protect CW-2 with the approval of the defendant.

CW-2 went on to discuss the events of October 14, 2020 when Ms. Butler was murdered, explaining the motive for the attack was that CW-2 owed the defendant drug proceeds (11/7/23 Tr. am session P. 35, 4-7).  CW-2 explained that he stopped by the defendant's home to provide him drug proceeds (11/7/23 Tr. am session P. 47, 10-12).  CW-2 stated that Aponte Rivera came to work with CW-2 as a bodyguard because "he was sold to me so that he could come work for me -- it's like he was a hitter for [the defendant] . . . like an enforcer, a person that would carry out violent acts to keep people in check, in line.  That's how he was sold to me."  (11/6/23 Tr. pm session P. 99, 14-18.)

CW-2 testified that shortly before the October 14, 2020 murder and after CW-2 believed his drug trafficking relationship with the defendant had concluded, the defendant encouraged CW-2 to go meet with Aponte Rivera.   (11/7/23 Tr. am session P. 47, 24-25; "Go see him (Aponte Rivera).")  The attack then occurred shortly after this statement by the defendant.

CW-2 also testified that in April of 2021, CW-2 unexpectedly came in contact with Aponte Rivera when they were both being detained at Northern Neck Regional Jail.  CW-2 testified that Aponte Rivera told CW-2 that "Gordo (the defendant) made him do it (the October 14, 2020 ambush)," and that the defendant "threatened (Aponte Rivera)" that Aponte Rivera's little brother would be harmed if Aponte Rivera did not follow through with the shooting (11/7/23 Tr. am session P. 72, 17-20).

Furthermore, during Aponte Rivera's April 15, 2021, post-arrest recorded interview, Aponte Rivera stated that the defendant gave Aponte Rivera a "Glock" to "shoot" CW-2[1]  (4/15/21 Tr. P. 57, 2, and 16-25).  Aponte Rivera also stated that because he did not kill CW-2 the defendant refused to pay him (4/15/21 Tr. P. 70, 7-25).

Even after the October 14, 2020 shooting of CW-2 and murder of Ms. Butler, the defendant and Aponte Rivera continued to distribute cocaine to others.  USPS Office of the Inspector General, Special Agent Armando Cardona testified at the Aponte Rivera trial.  During his testimony, SA Cardona explained to the jury that he reviewed Aponte Rivera's data from his cellular telephone and identified numerous text messages between the defendant and Aponte Rivera.  Specifically, in a November 4, 2020 text message, the defendant requested that Aponte Rivera obtain U.S. postal packages to mail cocaine, and they discussed wrapping the cocaine in a

---

[1] Aponte Rivera's video recorded statement and transcript were provided to the Court via USAfx prior to the Motion to Suppress hearing in *U.S. v. Aponte Rivera.*
During a proffer session with another cooperating witness, the cooperating witness told the government that Aponte Rivera acted impulsively when attacking CW-2 and Ms. Butler on October 14, 2020.

"towel." (11/7/23 Tr. pm session  P. 64, 14-19, P. 65, 1-7).  Additionally, during a November 12, 2020 text exchange, the defendant and Aponte Rivera discussed a .22 caliber firearm ("Durro"), and the defendant told Aponte Rivera to "buy something smaller."  (11/7/23 Tr. pm session P. 66, 11, P. 67, 1-4).  The defendant and Aponte Rivera also discussed disposing of a .45 caliber firearm, with Aponte Rivera telling the defendant "it's done."  (11/7/23 Tr. pm session P. 67,10 to P. 68, 7).  This was less than one month after Ms. Butler's murder. Notably, at trial, the Government produced evidence that 6, .45 caliber bullet projectiles and 7, .45 caliber shell casings were seized from the murder scene.

### SENTENCING RECOMMENDATION

**A.  Sentencing Guidelines**

Although the government understands the United States Probation's position, the government stands by its calculations in the plea agreement.  The Pre-Sentence Report (PSR) writer, Aidee V. Gavito,  calculated the defendant's total offense level at 37.  *See* PSR ¶ 53.  Ms. Gavito calculated the defendant's criminal history score as Category III.  *See* PSR ¶ 57.  Ms. Gavito calculated defendant's Guidelines range as 262-327 months imprisonment, with a mandatory-minimum sentence of 120 months imprisonment.  *See* PSR ¶¶ 92-93.

The government calculated the defendant's total offense level at 34, *see* Plea Agreement (Document 71 at 3).  The government believes the appropriate role adjustment should be as a Manager/Supervisor as defined in U.S.S.G §3B1.1(b), not as an Organizer/Leader as defined in U.S.S.G §3B1.1(a).  Therefore, the government believes the Guidelines range is 188 to 235 months imprisonment.

**B.  Nature and Circumstances of the Offense**

As stated above, this case involves a defendant who obtained a substantial amount of

cocaine, and then had it transported via the U.S. mail from Puerto Rico to the mainland United States. The defendant worked with numerous co-conspirators, both charged and uncharged, and the drug conspiracy lasted at least 18 months. The defendant continued to distribute cocaine to others even after the charged conspiracy ended, as evidenced by the April 9, 2021 U.S. postal receipt found in his residence at the time of the execution of the search warrant and the above-mentioned text messages describing continued drug trafficking. Law enforcement ultimately retrieved the package, which was destined for Albany, New York and it contained a kilogram of cocaine. *See* SA Cardona's trial testimony (11/7/23 pm session Tr. P. 59,11 to 62, 7).

Additionally, although not charged with the October 14, 2020 ambush of CW-2 and murder of Ms. Butler, the defendant played a pivotal role in those actions. The defendant had a motive to kill CW-2, since CW-2 owed the defendant significant drug proceeds. Also, shortly before the attack, the defendant told CW-2 to go meet Aponte Rivera, knowing that Aponte Rivera was going to shoot CW-2. The defendant was on a FaceTime call with CW-1 when Aponte Rivera told CW-1 that he executed Ms. Butler and tried to eliminate CW-2. According to Aponte Rivera, both in his post-arrest interview and his confession to CW-2 at Northern Neck Regional Jail, he said he was ordered by the defendant to kill CW-2. Within a month after the October 14, 2020 murder, the defendant told Aponte Rivera to dispose a .45 caliber firearm, which was the same caliber as the seven shell casing and six bullet projectiles recovered from the murder scene. Through the trial, there was no question Aponte Rivera was a violent individual, by placing a gun to CW-1's head, being hired by CW-2 as an armed bodyguard, and by the other trial testimony that Aponte Rivera was an enforcer for the Puerto Rico DTO and personally worked for the defendant.

In sum, the defendant's actions were nothing short of horrendous. He poisoned the

Washington, D.C. area with huge amounts of cocaine and employed a violent individual who shot and killed Ms. Bulter in furtherance of the drug conspiracy.  The defendant is accountable for 50 to 150 kilograms of cocaine coming into the Washington, D.C. area and it is incomprehensible how many individuals in our community, both addicts and their families, were adversely and permanently affected by the defendant's drug trafficking.  Therefore, the nature and circumstances of this long-term criminal offense and additional violent acts are very serious, and warrant a 235-month sentence of imprisonment.

### C.  Defendant's History and Characteristics

The defendant is a 40-year-old man; the defendant claims at the time of the offense he was self-employed as a cook; he could not recall the last time he filed a tax return.  *See* PSR ¶¶ 68, 85, 91.  The defendant has 2008-09 crime spree convictions for 13 counts of Identity Theft, 12 counts of Fraud, eight counts of Aggravated Larceny, and Forgery of Documents, for which he served 30 months imprisonment.  *See* PSR ¶¶  55.  The defendant also has a 2014 conviction for Possessing with Intent to Distribute Marijuana, where he received a sentence of two years imprisonment.  *See* PSR ¶¶  56.  The defendant appears to have five additional arrests three of which appear to be drug-related,  one is for possessing a firearm, and another involves aggravated abuse of a minor.  *See* PSR ¶¶  559-64.  Including the instant offense, the defendant has been involved in criminal conduct most of his adult life, which weighs in favor of the government's sentencing recommendation.

### D. Danger to the Community

The defendant remains a danger to the community.  He has a long-standing criminal history.  Additionally, as detailed above, even after this large-scale drug conspiracy and the October 14, 2020 murder of Ms. Butler, the defendant continued to ship kilograms of cocaine to

the mainland United States, and to advise his underlings on how to dispose of firearms.

Drug trafficking offenses are often erroneously referred to as victimless crimes. As the Court is well aware, trafficking between 50 and 150 kilograms of cocaine from outside the mainland United States to various areas of the United States has huge potential harm to law enforcement, to law abiding citizens, and most importantly, to drug addicts and their families. Once the kilograms are broken down to street-level quantities, the amount of cocaine the defendant is responsible for entering the community is staggering. Many drug addicts were harmed by the vast amount of cocaine the defendant supplied, new users were likely saddled with addiction because of the quantity of cocaine supplied by the defendant, and the harm caused to family members of addicts should not be overlooked. As one judge said in this courthouse, often family members of drug addicts suffer the most, by way of the financial, physical, and emotional toll it takes to see their family member suffer with addiction.

And most significantly, as this case makes clear, drug trafficking is a crime intertwined with violent crime. In this case, many defendants armed themselves with firearms, including CW-1, CW-2, Aponte Rivera, and the defendant as detailed in Aponte Rivera's post-arrest statement. Aponte Rivera stated in his recorded post-arrest interview, he was provided a firearm by the defendant to carry out the attack on CW-2 and Ms. Butler. As described in compelling detail at the Aponte Rivera trial, because of a drug debt owed to the Puerto Rico DTO headed by the defendant, Ms. Butler was shot two times in the head as she sat defenseless in an automobile. As Forensic Pathologist Dr. Javier Serrano testified, one of the bullets went right through Ms. Butler's brain. CW-2 was shot five times, and Aponte Rivera and others tried to make sure CW-2 was dead by trying to locate him after he fled the attack. The callousness of the murder is summed up by Aponte Rivera's FaceTime statement to CW-1 shortly after the

attack with the defendant in Aponte Rivera's presence – "Papi, you see the things that I do?," a reference to killing Ms. Butler and severely wounding CW-2 where he felt proud of his accomplishment.   The defendant will remain a danger to the community, and the government's sentencing recommendation aims to lessen the danger the defendant poses.

## **CONCLUSION**

Based on the forgoing, the government respectfully requests the Court sentence the defendant 235 months imprisonment followed by five years of Supervised Release and a $100 Special Assessment.

Respectfully submitted,

Matthew M. Graves
United States Attorney
D.C. Bar No. 481052

By:   _____
Anthony Scarpelli
D.C. Bar No. 474711
202-252-7707
anthony.scarpelli@usdoj.gov
David T. Henek
N.Y. Bar No. 5109111
 david.t.henek@usdoj.gov
202-252-7825
Assistant United States Attorneys
United States Attorney's Office
601 D Street, N.W.
Washington, D.C.